## S06A1975. STOKES v. THE STATE.
(642 SE2d 82)

HINES, Justice.

Keenan Stokes appeals his convictions for malice murder, armed robbery, and possession of a firearm during the commission of a felony in connection with the fatal shooting of Michael Norby. He challenges the sufficiency of the evidence; the refusal to excuse certain jurors for cause; the reversal of a peremptory strike; the death penalty qualification phase of voir dire; the admission into evidence of another

---

armed robbery; the refusal to suppress evidence of his alleged confession to law enforcement officers during his extradition to Georgia; a portion of the State's closing argument; the effectiveness of his trial counsel; the fairness of his trial under the totality of the circumstances; and the denial of his motions for new trial as amended. Finding the challenges to be without merit, we affirm.[1]

The evidence construed in favor of the verdicts showed that on the night of November 21, 2002, Michael Norby was shot and killed at Heritage Bank in Midway, a victim of four gunshot wounds to the head and torso. Stokes had a relative who worked at the Dollar General Store near the bank. Stokes learned that Willie Bacon drove to the bank each evening to make the store's night deposit. On the evening of November 21, Stokes, Randy Simmons, Samantha Faulk, and Marcus Gary conspired to rob Bacon as he made the night deposit, and the four drove to the bank; Faulk dropped off the three men at the bank. The men took an AK-47 assault rifle from the trunk of the vehicle. Stokes, Simmons, and Gary hid in various locations around the outside of the bank in order to ambush Bacon as he drove through the night deposit lane. Michael Norby drove up in a truck that resembled Bacon's. Stokes yelled, "there he go right there." Stokes emerged from the bushes and started shooting at Norby; he fired five to seven shots with the AK-47. After the shooting, the three assailants discussed what to do with Norby's body. Stokes and Simmons took the body from the truck and dragged it, face down, to a nearby wooded area. The assailants then searched the victim's truck looking for money, and found the victim's wallet, checkbook, and rifle. They walked to a nearby motel and paged Faulk to pick them up. Before Faulk arrived, Stokes walked off and disappeared. Simmons and Gary returned to the bank to pick up the shell casings from the crime scene.

The AK-47 used to kill Norby was recovered during a later armed robbery committed by Simmons, Gary, and Faulk. Forensic evidence linked a bullet recovered from Norby's body to that firearm. An

---

[1] The crimes occurred on November 21, 2002. On May 6, 2003, a Liberty County grand jury indicted Stokes for Count 1 – malice murder; Count 2 – felony murder while in the commission of aggravated assault; Count 3 – armed robbery; and Count 4 – possession of a firearm during the commission of a felony. On June 30, 2003, the State filed a notice of intent to seek the death penalty. Stokes was tried before a jury February 28, 2005-March 6, 2005, and found guilty of all charges. On March 6, 2005, he was sentenced to life in prison without parole on Count 1; life in prison on Count 3, consecutive to Count 1; and five years in prison on Count 4, consecutive to Counts 1 and 3. The verdict on Count 2 stood vacated by operation of law. Stokes filed motions for new trial on March 16, 2005, and March 21, 2005; he filed an amended motion for new trial on April 19, 2006. The motions for new trial, as amended, were denied on June 1, 2006. A notice of appeal to the Court of Appeals was filed on June 28, 2006. The appeal was transferred to this Court on July 25, 2006, and the case was docketed in this Court on July 28, 2006. The appeal was argued orally on November 6, 2006.

enhanced video from the bank's security system provided a corroborating visual account of the fatal shooting.

Stokes surfaced in Maryland and was incarcerated pending extradition to Georgia. Georgia law enforcement officers traveled to Maryland to retrieve Stokes. In an interview with the officers, Stokes commented, "[I]'m going to jail for the rest of my life for this." During the trip back to Georgia, Stokes repeatedly asked and commented about the murder, at one point blurting out, "I had to kill him, I didn't have a choice. What would you have done?"

1. Contrary to Stokes's contention, the evidence at trial was sufficient to enable a rational trier of fact to find him guilty beyond a reasonable doubt of the malice murder of Michael Norby and the other crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Stokes contends that the trial court erred in failing to excuse for cause three members of the venire, because they were biased and/or "improperly related." The decision to strike a potential juror for cause lies within the sound discretion of the trial court, and before a potential juror is so excused, it must be shown that the individual holds an opinion of the defendant's guilt or innocence that is so fixed and definite that the individual will not be able to set the opinion aside and decide the case based upon the evidence and the court's instructions. *Head v. State*, 276 Ga. 131, 133 (2) (575 SE2d 883) (2003). Moreover, the trial court's determination as to whether to strike a juror for cause will not be set aside absent some manifest abuse of its discretion. *Shiver v. State*, 276 Ga. 624, 625 (2) (581 SE2d 254) (2003). As to the issue of a disqualifying relationship, that is subject to the provisions of OCGA §§ 15-12-163 (b) (4)[2] and 15-12-135 (a).[3]

---

[2] OCGA § 15-12-163 (b) provides:
The state or the accused may make any of the following objections to the juror:
(1) That the juror is not a citizen, resident in the county;
(2) That the juror is under 18 years of age;
(3) That the juror is incompetent to serve because of mental illness or mental retardation, or that the juror is intoxicated;
(4) That the juror is so near of kin to the prosecutor, the accused, or the victim as to disqualify the juror by law from serving on the jury;
(5) That the juror has been convicted of a felony in a federal court or any court of a state of the United States and the juror's civil rights have not been restored; or
(6) That the juror is unable to communicate in the English language.

[3] OCGA § 15-12-135 (a) states:
All trial jurors in the courts of this state shall be disqualified to act or serve in any case or matter when such jurors are related by consanguinity or affinity to any party interested in the result of the case or matter within the sixth degree as computed according to the civil law. Relationship more remote shall not be a disqualification.

(a) Venireperson P. M.: Stokes argues that it was reversible error to refuse to excuse P. M. because her husband's sister was formerly married to the victim's brother and has a child with him, and because P. M. "repeatedly stated bias and lack of impartiality." But, the record does not support Stokes's argument. When P. M. informed the trial court about the past relationship by marriage, Stokes did not object to P. M. remaining on the jury panel; in fact, not only did Stokes's attorney fail to move to excuse P. M. for cause on that basis, but counsel expressly agreed with the trial court that the relationship failed to provide a legal ground for disqualification. And, certainly the relationship did not disqualify P. M. See OCGA § 15-12-135 (a). The trial court was not required to sua sponte excuse P. M. for cause. *Lawler v. State*, 276 Ga. 229, 235 (5) (576 SE2d 841) (2003). As for the claim that P. M.'s partiality mandated that she be excused for cause, it is unavailing as well. Ultimately, P. M. concluded that she could give Stokes a fair trial and base her decisions only upon the presented evidence and the given law.

(b) Venireperson K. M. P.: Stokes urges that it was reversible error to not excuse K. M. P. because her father was the elected Sheriff of Liberty County, and thus she had a "vested electoral and financial interest in this case being resolved by a successful prosecution," because she was friends with the victim's widow, and because of "her repeatedly stated bias and lack of impartiality." But, here again, Stokes's argument is unavailing. He did not move to excuse K. M. P. for cause. *Lawler v. State*, supra at 235 (5). Nor has Stokes demonstrated any basis for disqualifying K. M. P. merely because her father was sheriff; Stokes has not shown any direct involvement by the sheriff in the prosecution of the case.[4] Finally, the assertion that K. M. P.'s alleged bias prevented her from serving on the jury is without merit. The record shows that she firmly concluded, and so stated, that she could decide the case solely on the evidence presented.

(c) Venireperson W. J. P.: Stokes maintains that it was reversible error to fail to excuse W. J. P. from the jury panel as his mother was a victim/witness coordinator for the District Attorney's Office and his girlfriend was an Assistant District Attorney, and he had knowledge of the case because of these relationships. However, Stokes has failed to show how the District Attorney's employment of W. J. P.'s relative or friend legally disqualified W. J. P. from the venire. He has not

---

[4] In his supplemental brief following oral argument, Stokes raises the additional issue that by definition the deputy sheriff was the agent of the sheriff, and therefore, the sheriff would have to be deemed the prosecutor. However, a supplemental brief is not the vehicle for raising a new issue of law. See *Fargason v. State*, 266 Ga. 463, 464 (6) (467 SE2d 551) (1996). What is more, Stokes again ignores the fact that he never asked that K. M. P. be excused for cause.

demonstrated that either W. J. P.'s mother or girlfriend was a "prosecutor" within the meaning of OCGA § 15-12-163 (b) (4). *Bryant v. State*, 270 Ga. 266, 271 (4) (507 SE2d 451) (1998). As to the girlfriend, even if she had been the "prosecutor," W. J. P. was not yet related by marriage to her. *Croom v. State*, 217 Ga. App. 596, 597 (2) (458 SE2d 679) (1995).

Regarding the claim of bias on the part of W. J. P. because of the relationships and because of any prior knowledge of the case, W. J. P. stated unequivocally that he had not formed any opinion as to Stokes's guilt or innocence and that he could listen to the evidence and return a verdict of not guilty if the State failed to prove its case beyond a reasonable doubt.

3. Stokes used all of his peremptory strikes against Caucasian members of the venire. The State lodged a *McCollum*[5] challenge to the strikes, and the trial court found that Stokes's race-neutral explanation for striking one of the prospective male jurors, i.e., that the man appeared to be untruthful in his responses, was pretextual, and that the real motive was discriminatory. Consequently, the trial court sustained the State's challenge to that limited extent, removed the last juror chosen and made him the first alternate, and placed the man in question on the jury. Stokes challenges the trial court's finding that the articulated reason for striking the venireperson was pretextual, contending that the strike was not used in a discriminatory fashion; he also complains that the trial court's remedy of placing the challenged venireperson on the jury denied him the statutorily-required peremptory strikes.

In the situation in which a racially-neutral reason for the strike is given, the trial court must ultimately decide the credibility of such explanation, and because the third step of the *McCollum* procedure mandates that the trial court act as the trier of fact, the trial court's findings are to be given great deference and are to be affirmed unless clearly erroneous. *Allen v. State*, 280 Ga. 678, 679 (2) (631 SE2d 699) (2006). Stokes fails to make any showing that the trial court's rejection of the offered explanation as pretextual was in error. As for the trial court's remedy for the situation, Stokes expressly agreed with it;[6] thus, he cannot now complain. *Compton v. State*, 281 Ga. 45, 46 (2) (635 SE2d 766) (2006). Even had the issue been preserved for

---

[5] *Georgia v. McCollum*, 505 U. S. 42 (112 SC 2348, 120 LE2d 33) (1992).

[6] The trial court informed counsel of the procedure it would follow, and Stokes's attorneys responded variously: "That makes sense"; "Right. That is fine with the defense, Your honor"; and "we would go along with that."

appeal, the procedure employed by the trial court to remedy the improper strike was permissible. *Holmes v. State*, 273 Ga. 644, 646 (2) (543 SE2d 688) (2001).

4. Stokes next contends that the death penalty qualification of his jury resulted in the disproportionate removal of African-American venirepersons, in violation of the State and Federal Constitutions. He argues that the removal of jurors that are opposed to or question the death penalty results in juries that are more likely to convict than non-death penalty qualified juries, and that the death penalty views of these jurors would have had no negative impact against the State during the guilt or innocence phase of the trial. But, the death penalty qualification of prospective jurors is clearly authorized. See *Lewis v. State*, 279 Ga. 756, 761 (620 SE2d 778) (2005). The procedure did not deny Stokes impartial jurors. *Eberhart v. State*, 257 Ga. 600, 601 (6) (361 SE2d 821) (1987). Moreover, Stokes received a sentence of life without parole, and when a death sentence is not imposed, the complaint that prospective jurors who were opposed to capital punishment were excluded from service is not a valid ground to set aside such sentence. *Walker v. State*, 225 Ga. 734 (1) (171 SE2d 290) (1969).

5. Stokes contends that the trial court erred in allowing evidence of a separate armed robbery at a club in which Stokes did not participate, claiming such evidence was irrelevant, immaterial, improper, and prejudicial. He specifically takes issue with testimony pertaining to the recovery, during this other armed robbery, of the AK-47, the murder weapon in this case, arguing that the trial court improperly allowed the State to call multiple witnesses to corroborate Gary's testimony about how the weapon was taken from Simmons and this "improperly bolstered and increased the credibility, character and believability of the State's accomplice."[7] He further takes issue with the admission of testimony and physical evidence regarding the truck which Gary and his cohorts used as transportation in the armed robbery of the club and some "travel orders" that fell from the get-away truck, again arguing lack of relevance and improper bolstering of the State's witness. But, the arguments are wholly without merit.

Inasmuch as the same AK-47 was used in the armed robbery of the club and the crimes committed in this case, evidence relating to the use of this weapon and its recovery in the club incident was admissible. *Collins v. State*, 240 Ga. App. 289, 290-291 (1) (523 SE2d 359) (1999). Moreover, evidence of the truck and travel orders was relevant inasmuch as it was part of the trail that ultimately led to

---

[7] This appears to be a reference to Marcus Gary.

Stokes as Norby's killer. As to the assertion that the evidence was used for merely an improper bolstering effect, it too does not prevail. The evidence was authorized as corroboration of the testimony of the State's witness, Gary, who was Stokes's accomplice in the present crimes. *Baines v. State*, 276 Ga. 117, 119 (1) (575 SE2d 495) (2003). Finally, as to any complaint that this evidence implicated Stokes in the armed robbery of the club, Gary's testimony made it plain that Stokes did not take part in it.

6. There is likewise no merit to Stokes's contention that it was error to admit his inculpatory statements to Officer Howard during the extradition trip from Maryland to Georgia. He raises the credibility of Officer Howard in his account of the fact and content of such statements[8] and argues that the statements were inadmissible at trial also because they were made during a lengthy custodial police interview after Stokes asked to speak with a lawyer.

Following a *Jackson-Denno*[9] hearing, the trial court issued an order finding that Stokes was fully advised of his *Miranda*[10] rights and subsequently made various statements during the extradition trip; that all of the statements were freely and voluntarily made; were made without coercion, threats, violence, fear of injury, promise of leniency, or hope of benefit; and were completely spontaneous, not resulting from any action on the part of the officers, Howard and Cortez, who accompanied Stokes on the journey from Maryland to Georgia. Unless it is clearly erroneous, this Court is to uphold a trial court's determination regarding credibility relating to the admissibility of a defendant's statement at a *Jackson-Denno* hearing. *White v. State*, 281 Ga. 20, 22 (2) (635 SE2d 720) (2006). And the transcript of the *Jackson-Denno* hearing contains evidence to support the trial court's findings, including that the inculpatory statements at issue were not the result of interrogation or questioning but were spontaneously uttered by Stokes. "[A]n accused may waive the previously-invoked right [to counsel] by initiating further communication with the police." *Tesfaye v. State*, 275 Ga. 439, 441 (2) (569 SE2d 849) (2002). Accordingly, it was not error for the trial court to refuse to suppress Stokes's inculpatory statements made during his extradition.

---

[8] Stokes urges that there was pressure on the police to get a confession; therefore, "not surprisingly" one occurred, and cites the fact that the other Georgia law enforcement officer involved in his extradition, Cortez, did not hear this alleged confession, and it was not reduced to writing, signed, recorded, mentioned in the other officer's transport interview summary, repeated, or heard by anyone other than Howard.

[9] *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964).

[10] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

7. Stokes next contends that the State improperly argued facts not in evidence during closing argument when it asserted that Stokes knew Bacon, the intended victim of the armed robbery at the bank. But, Stokes did not object to this argument when it was made; therefore, the issue is not preserved. *Smith v. State*, 277 Ga. 213, 218 (11) (b) (586 SE2d 639) (2003). Even so, there was evidence at trial to support the statement that Stokes knew Bacon.

8. Stokes maintains that his trial counsel was ineffective before and during trial, citing numerous instances of alleged ineffectiveness. However, in order to prevail on a claim of ineffective assistance of counsel, Stokes must show two things: that counsel's performance was deficient, and that such deficiency prejudiced his defense. *White v. State*, 281 Ga. 276, 281 (6) (637 SE2d 645) (2006). Initially, Stokes must overcome the strong presumption that his attorneys' performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment. Id. Such reasonableness of judgment is examined from counsel's perspective at the time of trial and under the particular circumstances of the case. Id. In addition, Stokes must demonstrate a reasonable probability that, absent any unprofessional errors on his attorneys' part, the result of trial would have been different. Id. As to this Court's role, it is to independently apply the legal principles to the facts, but it must accept the trial court's factual findings and credibility determinations unless they are clearly erroneous. Id. Furthermore, in a situation, as in this case, when trial counsel does not testify at the hearing on the motion for new trial, it is extremely difficult for the defendant to overcome the strong presumption that trial counsel's performance was reasonable. *Davis v. State*, 280 Ga. 442, 443 (2) (629 SE2d 238) (2006); *White v. State*, supra at 281 (6).

(a) Stokes complains that trial counsel was ineffective because counsel "intentionally waived or failed to assert" his motion to change venue, which "condemned [him] to a jury pool that was inherently and actually prejudicial and which rendered a fair trial impossible." But, Stokes failed to show that the jury pool was inherently or actually biased, thereby affecting his right to a fair trial. The mere fact that some members of the venire may have had some relationship with or knowledge of the victim, a witness, or with someone in the offices of the county sheriff or district attorney does not demonstrate bias. See Division 2, supra. Moreover, Stokes ignores the positive responses of members of the venire when asked whether they would be able to put any prior associations aside and render a fair and impartial verdict based upon the evidence at trial.

Finally, there is no merit to Stokes's assertion that certain comments of the trial court at the motion for new trial hearing

indicating that it would have been amenable to changing venue establish that Stokes could not get a fair trial in Liberty County and that his trial attorney was required to pursue a change of venue. In fact, at that hearing, the trial court expressly found that Stokes's counsel made a wise strategic and tactical decision in having the trial remain in Liberty County.[11]

(b) Stokes next asserts that his counsel was ineffective for failing to make a *Batson*[12] challenge to the State's allegedly discriminatory use of peremptory strikes. He states that such decision was "clearly one of trial strategy as demonstrated by the record," but urges that such strategy was unreasonable, in that no competent attorney would have chosen it. But, that is not the case. The record demonstrates that the decision to refrain from a *Batson* challenge was a tactical decision in light of the remedy fashioned by the trial court for its found *McCollum* violation, and there is no basis upon which to find the decision unreasonable under the circumstances. See Division 3, supra. The mere fact that present counsel would have pursued a different strategy does not render trial counsel's strategy unreasonable. *Nix v. State*, 280 Ga. 141, 143 (3) (625 SE2d 746) (2006).

(c) Stokes alleges that trial counsel was less than effective for failing to contemporaneously object to the hearsay testimony of the woman who was the general manager of the Dollar General Store at the time of the crimes, to the effect that one of the store employees told her that the employee was related to Stokes. He argues that deficiency and prejudice were shown in not objecting to this testimony because it provided key support for the State's theory that Stokes obtained the information about the night deposit from this relationship; he also argues that the prejudice from the testimony was acknowledged by statements of the trial court at the motion for new trial hearing. However, the arguments are unavailing. Regardless of any offhand comments by the trial court in colloquy during the hearing, the trial court denied the motions for new trial, as amended, on all grounds. Moreover, prejudice cannot be shown by admission of the testimony because there was other evidence at trial that Stokes had prior knowledge of the night deposit by the store employee.[13]

---

[11] The trial court stated:
   Well, the Court's going to conclude [counsel] waved [sic] [the motion to change venue]. And I think they made a smart tactical decision. The death penalty has never been imposed by a jury here in Liberty County and they waved [sic] that along with where the case could potentially be transferred. And I think counsel made a very smart strategic decision and they waved [sic] it and the Court's going to deny your motion on that ground.

[12] *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986).

[13] Gary's testimony included the following:
   STATE: When the man arrived from the Dollar General how were you to know who

(d) Stokes next takes issue with his counsel's failure to contemporaneously object to what he labels as the speculative testimony of Detective Cortez, specifically Cortez's characterization of Stokes's conduct during the extradition trip "as an attempt to confess." But, this characterization was hardly speculative, or more significantly, resulting in prejudice to Stokes in light of the plainly admissible evidence of Stokes's inculpatory statements during the journey.

(e) Stokes lodges the general complaint that trial counsel "failed repeatedly to object to other matters and to preserve for appeal other issues and errors that occurred during trial" but fails to cite any specific events other than counsel's failure to object to three instances of what he claims were leading questions posed by the State to its own witnesses. But, Stokes does not assert, much less demonstrate, how such instances resulted in prejudice to him.

(f) Stokes also complains that trial counsel did not cross-examine certain of the State's witnesses, did not point out to the jury all of the State's "extra evidence," that is, numerous unneeded witnesses and physical exhibits, and did not tell the jury that none of the physical evidence admitted at trial directly linked Stokes to the crimes. But, here again, the complaint lacks any substance. Stokes certainly does not show how any choice to forego cross-examination of a witness or to refrain from comment on certain aspects of the State's case was deficient on the part of his counsel, much less that a deficiency of performance prejudiced him in any manner.

(g) Stokes contends that his trial counsel's performance was deficient for not having his "Maryland relative" testify at trial to refute the State's assertion that Stokes went to Maryland to flee the jurisdiction. But, neither Stokes, his trial counsel, nor the relative at issue testified during the motion for new trial hearing, and Stokes did not show that the testimony of the relative at issue would have been relevant and favorable to him. *Woods v. State*, 275 Ga. 844, 847 (3) (a) (573 SE2d 394) (2002).

(h) Stokes is likewise unsuccessful in his contention that trial counsel was ineffective for failing to assert an alibi defense, i.e., that he was with three people in another city during the time of the commission of the crimes. He urges that he requested that his counsel assert this alibi defense at trial, and that his counsel knew that all three of these people were ready, willing and able to testify. But, the

it was?
GARY: I ain't know who it was. He just said that the man was coming around there at this certain time. He said he knew what time.
STATE: He who?
GARY: Stokes. He said he knew what time the guy was going to come drop the money off.

record falls far short of establishing that trial counsel was aware of a viable alibi defense by virtue of the three individuals in question, who were Stokes's former girlfriend and the mother of his child, her sister, and her brother.

At the motion for new trial hearing, the three testified that Stokes was with them watching a football game the evening of the murder, but none of them notified the police of this after they learned that Stokes was arrested for the murder and related crimes. While the brother asserted that he was silent in order to let Stokes's lawyer handle things, trial counsel was not at the hearing to shed any light on the matter. Credibility issues associated with the witnesses aside, in the absence of evidence to the contrary, trial counsel's actions are presumed to be strategic. *Sweet v. State*, 278 Ga. 320, 326 (8) (602 SE2d 603) (2004). What is more, at the motion for new trial hearing, the trial court noted that defense counsel wanted to preserve final closing argument, which under appropriate circumstances is a valid strategic decision. *Phillips v. State*, 280 Ga. 728, 731 (2) (632 SE2d 131) (2006).

In summary, "[a] claim of ineffective assistance of counsel is judged by whether counsel rendered reasonably effective assistance, not by a standard of errorless counsel or by hindsight." *Hooks v. State*, 280 Ga. 164, 165 (3) (626 SE2d 114) (2006). Stokes has simply failed to show that trial counsel's performance was deficient so as to prejudice his defense. Id.

9. Stokes contends that he was denied a fair trial under the totality of the circumstances. He urges that when the trial is viewed as a whole, with all of the errors that occurred before and during trial and the ineffective assistance of trial counsel, the inescapable conclusion is that he did not receive a fair and impartial trial. However, Stokes has not prevailed in any of his claims of error, including his assertions of ineffectiveness on the part of trial counsel. See Division 8, supra. Moreover, Georgia does not recognize the cumulative error rule. *Watson v. State*, 278 Ga. 763, 770 (6) (604 SE2d 804) (2004); *Bridges v. State*, 268 Ga. 700, 708 (9) (492 SE2d 877) (1997).

10. Lastly, Stokes contends that the trial court improperly denied him a new trial, alleging that at the motion for new trial hearing it was established, inter alia, that he did not receive effective assistance of counsel at his trial, that prejudicial and reversible error occurred during jury selection, the evidence and closing arguments, and that there was insufficient evidence to warrant his convictions. But, that is plainly not the case inasmuch as his contentions of error enumerated in the appeal have been found to be unavailing.[14]

---

[14] As for any claims of error contained in Stokes's motions for new trial as amended, but not

836

*Judgments affirmed. All the Justices concur.*

DECIDED FEBRUARY 26, 2007 —
RECONSIDERATION DENIED MARCH 27, 2007.

*Kenneth W. Sheppard*, for appellant.

*Tom Durden, District Attorney, Mark A. Hendrix, Melissa L. Poole, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Chad E. Jacobs, Assistant Attorney General*, for appellee.

---

supported with argument or citation of authority in this appeal, they are deemed abandoned. *Marks v. State*, 280 Ga. 70, 75 (4) (623 SE2d 504) (2005).