## A11A1784. DOUGLAS v. THE STATE.
### (718 SE2d 908)

ELLINGTON, Judge.

A Clayton County jury found Joel Douglas guilty of two counts of aggravated assault, OCGA § 16-5-21 (a); three counts of possession of a firearm during the commission of a crime, OCGA § 16-11-106 (b); and five counts of false imprisonment, OCGA § 16-5-41 (a). Douglas appeals from the order denying his motion for a new trial, contending that the evidence was insufficient to support his convictions and that the trial judge erred in re-seating a juror and in admitting photographic evidence. Finding no error, we affirm.

Viewed in the light most favorable to the jury's verdict,[1] the record shows the following relevant facts. During the evening of March 22, 2008, several men robbed the Clayton Food Express convenience store in Clayton County, taking about $60,000. The victims, two store employees and three customers, testified that the robbers wore sunglasses, ball caps, and gloves. The robbers, who

---

[1] *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979).

were armed with guns, told the victims to get on the floor or they would be shot. One employee was beaten, kicked, tied up, and forced to the floor at gunpoint. One of the robbers took her wallet, cell phone, and car keys. Another employee was forced to get down on the floor. Because she was pregnant, the employee begged not to be kicked. The robber pointed a gun at her and said: "[D]on't look at me, I know who you are."

One of the store customers, who was playing a video game when the robbers entered the store, testified that one of the robbers pointed a gun at him, forced him to the floor next to an employee, and stole his wallet. Two other customers entered the store while the robbery was in progress. These customers were forced to the floor at gunpoint, tied up, and threatened. None of the victims was able to identify Douglas as one of the robbers. One victim, however, identified Douglas' co-defendant, Demario Mormon, at trial. Several of the victims testified that the robbers were speaking to each other in a foreign language.

Using the video-recording taken from the store's surveillance cameras, the police generated several photographs of the robbers and a photograph of the getaway car, a white Isuzu Trooper. When the local news media broadcast the images to the public, a man recognized one of the robbers as his employee, Carlos Hines, and contacted the police. The man testified that Hines speaks Spanish and drives a white Isuzu Trooper. Based on information gathered from an interview with Hines, the police developed a list of suspects that included Douglas, Lorenzo "Lolo" Buchanan, Alphonso Boyce, Armondo Boyce, and Mormon. The detective obtained a copy of Douglas' driver's license photograph and compared it to the surveillance photographs of one of the robbers. The Boyce brothers pleaded guilty to the crimes.

Hines testified at trial that he had known Douglas, Buchanan and the Boyce brothers from the neighborhood and that they had gone to parties together. He said that he has conversed with Douglas in Spanish. He testified that, before the robbery, Douglas, Buchanan (whom he knew as "Lolo"), and the Boyce brothers came to his house to visit. Both of the Boyce brothers, with the assistance of a Spanish interpreter, were called as witnesses, but refused to implicate their co-defendants at trial. Armondo Boyce, however, admitted that five men participated in the robbery, including himself, his brother, and three others whom he did not know. The State showed, however, that before he entered his guilty plea, Armondo Boyce identified one of his fellow robbers as "Lolo."

The State introduced into evidence a copy of the surveillance video and the still images generated from the video, four of which allegedly showed Douglas, who was wearing a white cap, at the scene

of the robbery. The State introduced the booking photographs of Douglas, Buchanan, Mormon, and the Boyce brothers. The State also produced a certified copy of Douglas' driver's license photograph and a photograph of Douglas taken at work, which shows him wearing a white cap.

1. Douglas challenges the sufficiency of the evidence against him in only one respect — none of the victims identified him as a participant in any of the crimes alleged in the indictment. Therefore, he contends, his convictions must be reversed. We disagree.

The State's evidence showed that, just before the armed robbery, Douglas, Buchanan, and the Boyce brothers met at Hines' house. Shortly thereafter, the Boyce brothers and three other men robbed the Clayton Food Express. The surveillance cameras at the store video-recorded the robbery, the robbers' faces, and their getaway car. The robbers' getaway car was identified as belonging to Hines. Hines led the police to other suspects, including Douglas. A copy of the surveillance video, still images taken from the video, and other photographs of Douglas were submitted to the jury. Although no witness positively identified Douglas as a participant in the crimes, the jury was authorized to conclude, based upon this evidence, that Douglas was one of the robbers. As we have explained,

> [i]dentity is a question of fact for the jury to decide. . . . [I]t is not beyond the ken of the average juror to decide as a matter of fact whether the identity of a person in a video is the defendant. And in a case in which a robbery of a convenience store was recorded by a surveillance camera, we held that the evidence of identity was sufficient because the jury had the opportunity to examine surveillance camera photographs of the robber and compare them with the defendant as he appeared at trial.

(Citations and punctuation omitted.) *Ferguson v. State*, 307 Ga. App. 232, 234 (1) (704 SE2d 470) (2010). See also *Buice v. State*, 289 Ga. App. 415, 417 (1) (657 SE2d 326) (2008) ("[T]he jurors were able to determine for themselves whether [the defendant's] appearance matched that of the perpetrator depicted in the store's surveillance videotape shown during the trial.").

Because the evidence adduced was sufficient to allow the jury to identify Douglas as a participant in the crimes beyond a reasonable doubt, this claim of error is without merit.

2. Douglas contends the trial court erred in re-seating a juror that he had used a peremptory strike to remove. Specifically, Douglas argues that the trial court erred when it granted the State's

*McCollum*[2] motion to re-seat Juror No. 12 on the jury panel. After Douglas and his co-defendants, who are black, used six of eight peremptory strikes against white members of the venire, the State made a motion asserting that the defense had exercised its strikes in a racially discriminatory manner. The judge agreed with the State's position with respect to Juror No. 12 and ordered that the juror be re-seated on the panel.

> In *McCollum*, the United States Supreme Court held that the equal protection clause prohibits the accused from engaging in purposeful discrimination on the basis of race in the exercise of peremptory strikes. A *McCollum* challenge triggers a three-step process: (1) the state must make out a prima facie case of racial discrimination; (2) if established, the burden of production shifts to the defendant to come forward with a race-neutral explanation; and (3) if a race-neutral explanation is tendered, the trial court must decide whether the state has proved purposeful racial discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

(Punctuation and footnotes omitted.) *Thomas v. State*, 299 Ga. App. 235, 236 (682 SE2d 325) (2009).

In evaluating the proffered race-neutral explanation, "the trial court must ultimately decide the credibility of such explanation[.]" (Citation omitted.) *Stokes v. State*, 281 Ga. 825, 829 (3) (642 SE2d 82) (2007). "[A]lthough a trial judge must accept a facially race-neutral explanation for purposes of determining whether the proponent has satisfied his burden of production at stage two, this does not mean that the judge is bound to believe such explanation at stage three." (Emphasis omitted.) *McKenzie v. State*, 227 Ga. App. 778, 779 (1) (490 SE2d 522) (1997). "[A] trial court's determination of a *McCollum* challenge rests largely on assessing the attorney's credibility and state of mind and therefore lies peculiarly within the province of the trial judge." (Punctuation and footnote omitted.) *Hicks v. State*, 281 Ga. App. 217, 219 (2) (635 SE2d 830) (2006). Accordingly, "where, as here, racially-neutral reasons are given, the ultimate inquiry for the trial court is not whether counsel's reasons are suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-based." (Citation and punctuation omitted.) *Smith v. State*, 264 Ga. 449, 454

---

[2] *Georgia v. McCollum*, 505 U. S. 42, 59 (IV) (112 SC 2348, 120 LE2d 33) (1992).

(4) (448 SE2d 179) (1994). Because the third step of the *McCollum* procedure requires the trial court to act as the trier of fact, its findings are entitled to great deference and will be affirmed unless clearly erroneous. *Stokes v. State*, 281 Ga. at 829 (3).

In the instant case, Douglas does not challenge the trial court's conclusion that the State had made a prima facie showing of racial discrimination. Accordingly, we review the court's rulings at the second and third steps of the *McCollum* analysis. The record shows that the court asked the defense to give race-neutral explanations for its strikes. With respect to Juror No. 12, Douglas' trial counsel stated that he struck the juror because

> he indicated that he knows Judge Benefield. And as a result of that, he's familiar with the . . . power-elite structure in the county, [by] knowing judges. And our concern is that he will give weight and credence to [the trial court's] rulings against Mr. Douglas and the other defendants in this case, if an objection is overruled and [the juror] may hold that against Mr. Douglas. Also, [the juror] indicated that there was a time when he was called for jury selection and the case stopped . . . because the defendant entered a plea. And so, we're concerned he may be cynical, as a result of that experience, the process.

After hearing these reasons, as well as the reasons articulated for striking the other jurors, the court heard the State's argument. The State pointed out that Juror No. 12 said that he had served as a juror in Judge Benefield's courtroom, not that he knew the judge personally. The State also argued that the reasoning articulated by the defense was pretextual. Douglas' counsel responded that, because the strikes were motivated by "reasonable and legitimate race neutral explanations," the court should "allow these strikes to stand."

The trial court accepted defense counsel's explanations for two of the six strikes and the State withdrew its *McCollum* motion as to the other three strikes. With respect to Juror No. 12, however, the court found that the juror "never said anything about knowing Judge Benefield at all." Rather, the court found that Juror No. 12 "said that he had served on a prior jury and [when he was asked for the name of the judge] . . . he just happened to recall that Judge Benefield was the trial judge." The trial court also found that many jurors on the panel testified that they had served on prior juries "and there was no inquiry about who [the presiding] judge was, whether [the presiding] judge was white or black, whether [the presiding] judge was part of the power structure or not." The court also noted

that Douglas' belief that Juror No. 12 might be cynical toward the justice system was not a sufficient basis for removing the juror because, "[t]ime after time, jurors are brought up and then stand in the hallway and then they are told, well, the defendant plead[ed] guilty, y'all go back downstairs. That happens all the time." The court found defense counsel's explanation insufficient and re-seated Juror No. 12.

Implicit in the court's stated reasons for re-seating Juror No. 12 is a determination that counsel's explanation lacked credibility. Applying the deferential standard of review, we conclude that the trial court did not clearly err in re-seating Juror No. 12 upon concluding that the State had met its burden of showing that counsel had acted with discriminatory intent in striking that juror.

3. Douglas contends the court erred in admitting into evidence over his hearsay objection and a co-defendant's confrontation clause objection[3] a copy of Douglas' driver's license photograph because the document was not certified. A review of the record, however, reveals that the document was, indeed, properly certified as required by OCGA § 24-7-20. Therefore, the document was admissible in evidence as a public record pursuant to OCGA § 24-3-17 (a), which provides, in relevant part, that a "certified copy of any record of the Department of Public Safety or the Department of Driver Services . . . is admissible in any judicial proceedings or administrative hearing in the same manner as the original of the record." Because the document was a properly certified public record, the trial court was permitted to infer the reliability of any hearsay contained therein and to conclude that no confrontation clause violation had been shown. *Shapiro v. State*, 233 Ga. App. 620, 622 (3) (504 SE2d 719) (1998) (DPS records "are public records which allow a court to 'infer reliability when the hearsay falls within a firmly rooted exception to the hearsay rule, such as the public records exception.' *Price* [*v. State*, 269 Ga. 222, 223 (498 SE2d 262) (1998)]."). Consequently, we find no error.

*Judgment affirmed. Miller, P. J., and Doyle, J., concur.*

DECIDED NOVEMBER 15, 2011 — ■

*David J. Walker*, for appellant.

---

[3] The court permitted the objection of any one defendant to preserve error as to all defendants.

*Tracy Graham-Lawson, District Attorney, Elizabeth A. Baker, Assistant District Attorney*, for appellee.